UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

In re CALPINE CORPORATION  :
et al.,  :
 :
 :    08 Civ. 1286 (VM)
            Debtors.  :
---------------------------------:    **DECISION AND ORDER**
COMPANIA INTERNACIONAL  :
FINANCIERA S.A. et al.,  :
 :    ┌──────────────────────────┐
            Appellants,  :    │ **USDS SDNY** │
 :    │ **DOCUMENT** │
  - against -  :    │ **ELECTRONICALLY FILED** │
 :    │ **DOC #:** _____ │
CALPINE CORPORATION et al.,  :    │ **DATE FILED:** 6/9/08 │
 :    └──────────────────────────┘
            Appellees.  :

--------------------------------X

**VICTOR MARRERO, United States District Judge.**

Appellants Compania Internacional Financiera, S.A.,
Coudree Global Equities Fund, Standard Bank of London, and
Leonardo Capital Fund SPC (collectively, "Compania
Appellants"), holders of over 25 million shares of Calpine
Corporation ("Calpine") common stock, appealed (the "Compania
Appeal") the following orders of the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy
Court"), pursuant to 28 U.S.C. § 158(a) and Federal Rules of
Bankruptcy Procedure 8001(a) and 8002(a): (1) Order Approving
Debtors' Motion Seeking Approval of Immaterial Modifications
to Debtors' Joint Plan of Reorganization Without the Need for
Further Solicitation of Votes, dated December 19, 2007 (the
"Modification Order"); (2) Findings of Fact, Conclusions of

1

Law, and Order Confirming Sixth Amended Joint Plan of
Reorganization, dated December 19, 2007 ("Confirmation
Order"); and (3) Minute Order Denying Motion to Reconsider
Confirmation Order and Second Modification Order, dated
January 15, 2008 ("Order Denying the Reconsideration Motion")
(collectively, the "Orders").[1] Appellants David Flair, Avram
Ninyo and Merle Root (collectively, "Flair Appellants"), and
Elias A. Felluss ("Felluss") (collectively with Compania
Appellants, "Appellants"), holders of Calpine common stock,[2]
appealed the Orders of the Bankruptcy Court (collectively with
the Compania Appeal, the "Appeals").[3] By Order dated February
28, 2008, this Court consolidated the Appeals for all
purposes. (See Order dated February 28, 2008, Docket No. 8.)
For the reasons set forth below, the Appeals are denied.

---

[1] The Compania Appeal also includes the following two rulings for which no
order was entered: (1) the Bankruptcy Court's denial of Compania
Appellants' request for document production from Calpine and its
affiliated debtors and debtors in possession (collectively with Calpine,
"Debtors") on January 8, 2008; and (2) the Bankruptcy Court's decision to
strike analyst reports on January 15, 2008. (See Compania Appellants'
Notice of Appeal, dated January 18, 2008, at 2 n.1.)

[2] Flair Appellants owned over three million shares of Calpine stock and
Felluss owned approximately 44,000 shares of Calpine stock.

[3] In addition to the Orders, Felluss is appealing: (1) "[s]uspension of the
Due Process clause of the United States Constitution, Bill of Rights, 5th
Amendment in favor of Debtor estate's desire to acquire favorable
financing terms," and (2) the following two rulings for which no order was
entered: (i) the Bankruptcy Court's "denial of [Appellants'] request for
a review of third party calculations upon which experts relied to make
determinations to valuation and were ministerial in nature having been
made in [Felluss's Motion for Reconsideration, dated December 28, 2008
("Felluss's Reconsideration Motion")]...; and (ii) the [Bankruptcy
Court's] decision to ignore the request for an examination of ... the
[third] party, whose metrics were used to prepare valuations ...."
(Felluss' Notice of Appeal, dated January 28, 2008, at 2, 4.)

## I.  BACKGROUND

A.  CHAPTER 11 PROCEEDINGS

Beginning on December 20, 2005, Debtors (274 in total) filed with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. § 101 et seq., (the "Bankruptcy Code") commencing Debtors' chapter 11 cases.  Pursuant to the Bankruptcy Code, on January 9, 2006, the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors of Calpine (the "Creditors' Committee" or collectively with Debtors, "Appellees") and, on May 9, 2006, appointed the Official Committee of Equity Security Holders ("Equity Committee") to represent the interests of Calpine's former shareholders ("Old Calpine Shareholders").

Debtors filed a joint plan of reorganization ("First Plan") and a disclosure statement for the First Plan ("First Disclosure Statement") pursuant to the Bankruptcy Code on June 20, 2007.  The First Plan was a waterfall of distributions in the form of reorganized Debtors' common stock ("New Calpine Common Stock") to unsecured creditors first, and, if any value remained, to Old Calpine Shareholders in accordance with the priorities established by the Bankruptcy Code and based on a total enterprise value ("TEV") as determined by the Bankruptcy

3

Court.  The First Disclosure Statement estimated Debtors' TEV to be $20.3 billion dollars[4] as of the assumed effective date, on or about December 31, 2007.  Under the First Plan, Debtors' estimates of the value of potential recoveries "assume no distributions on account of any [old Calpine common stock]." (First Disclosure Statement, dated June 20, 2007, at 151.)

In September 2007, Debtors filed a second and third joint plan of reorganization ("Second Amended Reorganized Plan" and "Third Amended Reorganized Plan") and a second and third disclosure statement ("Second Amended Disclosure Statement" and "Third Amended Disclosure Statement") proposing and describing essentially the same waterfall plan contained in the First Plan and First Disclosure Statement.  In addition, the Second and Third Amended Disclosure Statements explained that Debtors would update their TEV calculation prior to the voting deadline set forth in the corresponding disclosure statement (the "Voting Deadline").

The Equity Committee opposed Debtors' motion to approve the Third Amended Disclosure Statement, objecting to Debtors' plan to update their TEV calculation prior to the Voting Deadline.  The Bankruptcy Court held a hearing on the adequacy of the Third Amended Disclosure Statement on September 25,

---

[4] The Creditors' Committee asserted that the TEV was estimated too high and the Equity Committee asserted that the TEV was estimated too low.  (See First Disclosure Statement at 3-4.)

2007, and, the next day, entered an Order (the "Disclosure Statement Order") (a) approving the adequacy of Debtors' Third Amended Disclosure Statement; (b) approving solicitation and notice procedures with respect to confirmation of Debtors' proposed plan of reorganization; (c) approving the form of various ballots and notices; and (d) scheduling certain dates, including   December 10, 2007 as the close of discovery, November 30, 2007 as the confirmation objection deadline (the "Confirmation Deadline"), and December 17, 2007 as the beginning date of the confirmation hearing (the "Confirmation Hearing").

Debtors filed a fourth joint plan of reorganization ("Fourth Amended Reorganized Plan") and a fourth disclosure statement ("Fourth Amended Disclosure Statement") on September 27, 2007.   The following day, the Equity Committee filed a notice of appeal from the Disclosure Statement Order and sought a stay of the order pending appeal.   The Bankruptcy Court denied the Equity Committee's request for a stay on October 4, 2007.

On or about October 5, 2007, Calpine's creditors and shareholders were mailed the following materials: a cover letter, the Disclosure Statement Order, the Fourth Amended Disclosure Statement, the Fourth Amended Reorganized Plan, notice of the Confirmation Hearing and Confirmation Deadline,

solicitation procedures, and ballots (collectively, the "Disclosure Statement Materials").

In an effort to resolve continuing discovery disputes, Debtors, the Creditors' Committee, and the Equity Committee filed a joint motion ("Joint Motion"). The Bankruptcy Court granted the Joint Motion ("Order Granting Joint Motion") approving: (a) the adequacy of the Debtors' disclosure statement; (b) solicitation and notice procedures; (c) the form of various ballots and notices; and (d) the scheduling of certain dates. The Order Granting Joint Motion, together with the Disclosure Statement Order, established the ground rules for interested parties to engage in discovery and participate in the TEV trial and confirmation proceedings.

On November 19, 2007, Debtors filed an updated TEV analysis (the "Updated TEV"), estimating the TEV at $19.35 billion. The Updated TEV projected that Old Calpine Shareholders would receive no recovery. Between the Bankruptcy Court's approval of the Fourth Amended Disclosure Statement[5] in September 2007, and the planned commencement of the Confirmation Hearing in December 2007, Debtors, the Creditors' Committee, the Equity Committee, and various other parties in interest engaged in discovery related to valuation

---

[5] Debtors filed a fifth joint plan of reorganization ("Fifth Amended Reorganization Plan") approximately one week before the Confirmation Hearing.

6

in accordance with the deadlines set forth in the Disclosure Statement Order.  On November 20, 2007, pursuant to Federal Rule of Evidence 706, the Bankruptcy Court appointed Bridge Associates, LLP (the "Court-Appointed Expert") to assist in determining Debtors' TEV.

By the Confirmation Deadline, Debtors received approximately fifty objections raising confirmation-related issues, including the Equity Committee's Preliminary Objection to the Confirmation of Debtors' Fourth Amended Reorganized Plan, dated November 30, 2007.  Appellants, however, did not file an objection.

In December 2007, Debtors, the Creditors' Committee, and the Equity Committee, aided by the Court-Appointed Expert, negotiated a settlement (the "Settlement") valuing Debtors' TEV at $18.95 billion.  The TEV proposed by the Settlement provided no recovery to Old Calpine Shareholders.  However, as part of the Settlement,  Debtors agreed to provide Old Calpine Shareholders with potentially valuable warrants (the "Warrants") in consideration of the Creditors' Committee and the Equity Committee withdrawing any objections to Debtors' joint plan of reorganization.

On December 18, 2007, Debtors filed their Motion Seeking Approval of Immaterial Modifications to the Plan (the "Modification Motion") to be heard at the Confirmation

Hearing.  The Modification Motion included the terms of the Settlement.  Debtors served the Modification Motion on the Creditors' Committee, the Equity Committee, and all parties in interest as listed in Federal Rule of Bankruptcy 2002.

The Bankruptcy Court approved the Modification Motion on December 19, 2007, finding that "the construct of the settlement stipulations and the modifications of the plan are not material and do not adversely affect the treatment of claims or interests," and noted its "approval of the parties' efforts to construct the plan modifications in such a way that it does comply with Rule 3019."  (Hr'g Tr. 30:4-9, Dec. 19, 2007.)   That same day, the Bankruptcy Court issued the Modification Order stating that "[p]ursuant to sections 1127 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3019, [Debtors] shall not be required to resolicit acceptances of the modified Plan or prepare and distribute a new Disclosure Statement with respect to the modified Plan," and that the "modified Plan is deemed accepted by all creditors who have previously accepted the Plan prior to the modifications and such acceptances cannot be withdrawn."   (See Modification Order at 2.)  Also, on that day, the Bankruptcy Court entered the Confirmation Order confirming in all respects Debtors' Sixth Amended Joint Plan of Reorganization ("Sixth Amended Reorganized Plan").

8

On December 31, 2007, Appellants filed a motion to reconsider the Modification Order and Confirmation Order (the "Reconsideration Motion"). In addition, on January 2, 2008, Compania Appellants filed an ex-parte motion seeking document production from Debtors that the Bankruptcy Court denied on January 8, 2008. The Bankruptcy Court subsequently issued the Order Denying the Reconsideration Motion and granted Debtors' motion to strike certain analyst reports.[6] In its ruling, the Bankruptcy Court stated that "[t]he [Compania Appellants] ... now want a do-over for which there is simply no basis. Having failed to appear and participate in a detailed scheduled discovery and confirmation process and pursue their objections, there is no basis to now reopen the proceedings to allow them to retry the issues they now seek to raise." (Jan. Hr'g Tr. 51:5-21.)

On January 18, 2008, Compania Appellants filed the Compania Appeal. Simultaneously, Compania Appellants filed a motion in the Bankruptcy Court for a limited stay of the Confirmation Order and Modification Order[7] pending the outcome of the Compania Appeal to obtain

    (a) a stay of the distribution of the [Warrants] to

---

[6] On December 28, 2008, Felluss also filed a motion for reconsideration. The Bankruptcy Court denied Felluss's Reconsideration Motion, finding no basis to grant the motion and noting that it was "ground in conjecture." (Hr'g Tr. 53:10-17, January 15, 2008 ("Jan. Hr'g Tr.").)

[7] Appellants Flair and Nino joined the motion on January 23, 2008.

existing shareholders and (b) the issuance and reservation of: (i) sufficient shares to cover any shares that must be issued assuming all of the [Warrants] are ultimately exercised, plus (ii) an additional three hundred million shares from the one billion five hundred million shares authorized under the Sixth Amended Reorganized Plan for the benefit of existing shareholders pending the outcome of the appeal and further order of the District Court.

(Motion of Compania Appellants for a Limited Stay Pending the Appeal of the Confirmation Order and Modification Order Pursuant to Federal Rule of Bankruptcy Procedure 8005, dated January 18, 2008 ("Stay Motion"), at 2.)

On January 24, 2008, the Bankruptcy Court denied the Stay Motion.[8] (See Order Denying Limited Stay at 15.) The Bankruptcy Court noted that the Modification Motion

did not materially and adversely affect the treatment of equity security holders. Contrary to the assertions of the [Compania Appellants], at no time was equity guaranteed to receive any distribution on account of their interests pursuant to the [Sixth Amended

_____

[8] The Bankruptcy Court found that:

a stay would cause potentially substantial, irreversible injury to [Debtors], their creditors, and other stakeholders. ... [Debtors'] operations will be funded through a $7.6 billion secured exit-financing facility. [Debtors'] exit financing agreement, however, states that, as a condition of closing, the [Bankruptcy Court's] confirmation order "shall not have been stayed ... or modified." A stay of the Confirmation Order would present a substantial risk that a condition precedent to financing will fail and [Debtors] could lose their exit financing, forcing them back to restructuring, looking to obtain new exit financing in an unfavorable capital market environment. The evidence shows that if [Debtors] were required to negotiate a new exit financing commitment at this stage, [Debtors] would incur an additional $900 million in aggregate interest expense alone.

(Memorandum Decision and Order Denying Motion of [Compania Appellants] for a Limited Stay Pending Appeal of Confirmation Order and Modification Order, dated January 24, 2008 ("Order Denying Limited Stay"), at 10.)

> Reorganized Plan].   When [Debtors] announced their
> updated TEV on November 20, 2007, the mid-point value
> provided no recovery of any kind to equity security
> holders.  The [Sixth Amended Reorganized Plan] was simply
> a waterfall plan with distributions to creditors and
> equity security holders based upon an enterprise value to
> be determined by this Court, based in large part on the
> reports of the industry experts, at the confirmation
> hearing. Based on those reports and the representations
> of all the parties, this Court found the TEV of $18.95
> billion was justified and reasonable ..., at that level,
> equity holders would receive no distribution on account
> of their interests.  However, due to negotiations among
> the parties, equity holders were guaranteed the right to
> receive [Warrants] rather than no distribution at all. As
> such, the [Sixth Amended Reorganized Plan] as confirmed,
> actually improved equity's position.

(Id. at 4.)

Compania Appellants filed an emergency motion with this Court for an expedited appeal and a limited stay pending its appeal ("Expedited Motion").   Flair Appellants joined the Expedited Motion.  On February 1, 2008, the Court denied the Expedited Motion noting that it was "largely persuaded that the stay application has been mooted by the closing of the exit financing and the issuance of the common stock as contemplated by the confirmed plan."   (Hr'g Tr. 67:10-12, February 1, 2008 ("Feb. Hr'g Tr.").)   The Court also stated that Compania Appellants had not satisfied the statutory standards for a stay because their "core due process arguments substantially constitute efforts to attack the results of judicial proceedings of which [Compania Appellants] were aware, in which they could have participated directly but

11

chose not to, and as to which they made the strategic decision

to rely on a representative body that ultimately determined to

settle rather than litigate the valuation issues it had raised

...." (Id. at 69:18-24.) The Court explained that

> There is no indication or evidence here that [Compania
> Appellants] even took advantage of the opportunity to
> receive automatic notifications of court events ... Such
> willful distancing of a party in interest from
> fast-moving, high-stakes proceedings as to which the
> record demonstrates it was given initial notice as
> required by the rules and in which the [B]ankruptcy
> [C]ourt made determinations that the parties agreed
> enterprise valuation was appropriate and that, in light
> of that valuation, the further plan modifications that
> were noticed out pursuant to the Rule 3019 procedure were
> not material, undermines significantly the possibility
> that the objectors would be able to demonstrate on appeal
> that they experienced denial of notice and opportunity
> sufficient to constitute relief on constitutional
> grounds.

(Id. at 70:1-11.)

## B.   IMPLEMENTATION OF THE REORGANIZATION PLAN

Following entry of the Confirmation Order on December 19,

2007, Debtors undertook several steps required to implement

the Sixth Amended Reorganized Plan, including: (1) resolving

outstanding claims; (2) obtaining approval of the New York

Stock Exchange ("NYSE") and the Depository Trust Company to

re-list Calpine stock; (3) coordinating with the indentured

trustees to effect distributions to the beneficial owners of

claims; (4) modeling the waterfall effect of the Sixth Amended

Reorganized Plan to calculate the distribution reserves and

imputed share price; and (5) ensuring that the effects of the

12

various entered-into settlements were implemented in the distribution.  (See Declaration of Barry Folse in Support of Debtors-Appellees Response to Appellants' Opening Briefs, dated March 27, 2008 ("Folse Decl."),[9] at ¶ 9.)

On January 31, 2008 (the "Effective Date") the Sixth Amended Reorganized Plan became effective.  On that date, Calpine emerged from Chapter 11 and began conducting business operating as New Calpine ("New Calpine").  (See id. at ¶ 11.)

Following the Effective Date, New Calpine engaged in numerous actions to consummate the Sixth Amended Reorganized Plan, including: (i) discharging more than $12 billion of Calpine's debt held by over 2,600 creditors'; (ii) closing on a $7.3 billion exit financing facility; (iii) using $3.88 billion from the exit facility to pay off their debtor in possession financing facility; (iv) making wire transfers to satisfy various secured and administrative claims aggregating over $4 billion; (v) issuing approximately 417 million shares of New Calpine Common Stock to thousands of creditors; (vi) distributing 9.7 million shares of New Calpine Common Stock to

---

[9] Appellants argue that declarations can not be submitted in support of a determination on the merits of an appeal. (See Reply Brief of Appellants, dated April 7, 2008 ("Appellants' Reply Br."), at 4.)  However, a determination of whether an appeal is equitably moot is not a determination on the merits.  See, e.g., In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993) ("Chateaugay I") (stating that "dismissal is appropriate when the appellant has made no effort to obtain a stay and has permitted such a comprehensive change of circumstances to occur as to render it inequitable for the appellate court to reach the merits of the appeal") (citations and internal quotation marks omitted).

13

an escrow account for the benefit of certain holders of unsecured bonds pending resolution of an intercreditor dispute; (vii) causing the stock of New Calpine to begin trading on the NYSE on February 7, 2008; and (viii) issuing 48.5 million Warrants to Old Calpine Shareholders. (See id. at ¶¶ 12-18.)

Thus, substantially all of the property Debtors proposed to be transferred, and all equity interests in Calpine proposed to be cancelled under the Sixth Amended Reorganization Plan, were transferred and cancelled, respectively; New Calpine assumed all business operations and all property addressed in the Sixth Amended Reorganized Plan; and substantially all distributions to be made under the Sixth Amended Reorganized Plan have been completed. (See id. at ¶¶ 19-20.)

Additional transactions have also taken place in reliance on the Sixth Amended Reorganization Plan. For example, the confirmation and implementation of the Sixth Amended Reorganization Plan served as a catalyst for completing distributions by Calpine's subsidiaries in Canada ("Canadian Debtors"), which sought protection under the Canadian Companies' Creditor Arrangement Act by commencing proceedings in the Court of Queen's Bench in Calgary, Alberta (the "Calpine Canadian Proceedings"). (See id. at ¶ 27.) In

14

particular, on January 15, 2008, the Canadian Debtors obtained approval of certain distributions to creditors that were dependent upon implementation of the confirmed Sixth Amended Reorganization Plan. (See id. at ¶ 28.) In addition, on February 8, 2008, the Canadian Debtors, relying on the fact that those distributions had been made, applied for and obtained an order terminating the Calpine Canadian Proceedings, and distributions to Canadian stakeholders were calculated using the TEV embodied in the Sixth Amended Reorganization Plan. (See id. at ¶¶ 28-29.)

## II.  **DISCUSSION**

A.  LEGAL STANDARD

When a plan of reorganization has been substantially consummated, an appeal is presumed moot. See In re Chateaugay Corp., 94 F.3d 772, 776 (2d Cir. 1996) ("Chateaugay III") ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization."); In re Enron Corp., 326 B.R. 497, 502 (S.D.N.Y. 2005); In re Best Prods. Co., 177 B.R. 791, 803 (S.D.N.Y. 1995); In re Texaco Inc., 92 B.R. 38, 46 (S.D.N.Y. 1988). Substantial consummation is defined under the Bankruptcy Code to mean:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or

15

substantially all of the property dealt with by the plan;
and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2); see also In re Metromedia Fiber Network,
Inc., 416 F.3d 136, 144 (2d Cir. 2005); Texaco, 92 B.R. at 46
n.12.

Mootness has two aspects in the context of a bankruptcy
appeal. First, Article III of the Constitution requires that
there be an actual case or controversy for which the court may
grant effective relief. See In re Best Prods. Co., 68 F.3d
26, 29-30 (2d Cir. 1995); In re Chateaugay Corp., 10 F.3d 944,
952 (2d Cir. 1993) ("Chateaugay II"); Chateaugay I, 988 F.2d
at 325. Second, equitable considerations provide that even
if the court could conceivably fashion relief, the appeal
should be dismissed as moot if implementation of that relief
would be inequitable. See Metromedia, 416 F.3d at 143; Best
Prods., 68 F.3d at 30; Chateaugay I, 988 F.2d at 325.

These principles are "especially pertinent" in the
bankruptcy context, "where the ability to achieve finality is
essential to the fashioning of effective remedies."
Chateaugay I, 988 F.2d at 325. It is for this reason that
substantial consummation of a reorganization plan will often
moot an appeal. See, e.g., Metromedia, 416 F.3d at 144
("Equitable mootness is a prudential doctrine that is invoked
to avoid disturbing a reorganization plan once implemented.");
Chateaugay I, 988 F.2d at 326 ("As a practical matter,

16

completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."); Texaco, 92 B.R. at 45 ("When a confirmed plan of reorganization is involved, ... it is not hard to imagine that hundreds or even thousands of good-faith transactions by innocent parties may be undertaken in reliance thereon before an appeal is decided on the merits. Under such circumstances, it would be manifestly unjust to reverse on appeal ....").

The failure to seek a stay of the confirmation order pending appeal, with the result that the reorganization is substantially consummated, in particular lends itself to a finding that an appeal is moot. See Texaco, 92 B.R. at 46 ("Under these circumstances there fairly exists a strong presumption that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay.") (citation and quotation omitted); accord Enron, 326 B.R. at 502.

However, although a "momentous event," substantial consummation does not necessarily make it impossible or inequitable for a court to grant effective relief. Chateaugay II, 10 F.3d at 952. An appellant can overcome the presumption of mootness by establishing all of the following five factors (the "Chateaugay factors") set out by the Second Circuit in

17

Chateaugay II:

> (a) the court can still order some effective relief;
> (b) such relief will not affect the re-emergence of the
> debtor as a revitalized corporate entity; (c) such relief
> will not unravel intricate transactions so as to knock
> the props out from under the authorization for every
> transaction that has taken place and create an
> unmanageable, uncontrollable situation for the Bankruptcy
> Court; (d) the parties who would be adversely affected by
> the modification have notice of the appeal and an
> opportunity to participate in the proceedings; and (e)
> the appellant pursued with diligence all available
> remedies to obtain a stay of execution of the
> objectionable order[,] if the failure to do so creates a
> situation rendering it inequitable to reverse the orders
> appealed from.

Id. at 952-53 (citations and quotation marks omitted).

B.    APPLICATION

    1.    The Sixth Amended Joint Plan of Reorganization Was
          Substantially Consummated

Debtors have presented ample evidence that the Sixth
Amended Joint Plan of Reorganization was substantially
consummated.  As explained above, substantially all of the
property proposed to be transferred has been transferred, and
all equity interests proposed to be cancelled have been
cancelled; Debtors have assumed all business operations and
all property addressed in the Sixth Amended Reorganization
Plan; and distributions under the Sixth Amended Reorganization
Plan have nearly been completed.

Appellants do not dispute that Calpine has substantially
consummated the Sixth Amended Reorganization Plan.  Therefore,
the Court finds that the Sixth Amended Reorganization Plan has

18

been substantially consummated, creating a presumption that the Appeals of the Bankruptcy Court's Orders are moot. The burden is thus on Appellants to satisfy the five Chateaugay factors to overcome the mootness presumption. See In re Adelphia Commc'ns Corp., 367 B.R. 84, 94 (S.D.N.Y. 2007).

2.    The Chateaugay Factors Have Not Been Met

Appellants have not established all of the five Chateaugay factors necessary to rebut the presumption that the Appeals are moot.

a.    It Is Highly Improbable that the Court Can Fashion Effective Relief

The first factor that Appellants must establish in order to rebut the mootness presumption is that the Court can fashion effective relief. See Chateaugay II, 10 F.3d at 952-53. However, "[a]n appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." Metromedia, 416 F.3d at 143 (citation and quotation marks omitted).

Appellees claim that Appellants failed to indicate exactly what relief they are seeking in their opening briefs, but that they appear to be seeking: "(1) the vacatur of the Confirmation Order; (2) to turn the clock back to the beginning of the confirmation process so that Appellants can obtain discovery and inspect and re-value the Debtors' assets

19

..., and the Bankruptcy Court can hold a new valuation trial;
(3) the issuance of up to 300 million additional shares of New
Calpine Common Stock, not contemplated by the [Sixth Amended
Reorganization Plan], to be held in reserve pending a second
determination of TEV; and (4) the redistribution of cash and
stock in accordance with the Court's findings." (Brief of
Appellee Creditors' Committee, dated March 28, 2008, at 25.)
Appellants state in their reply brief, however, that Appellees
"grossly mischaracterize" the relief they seek and claim they
are seeking: (1) "to require Debtors to reserve three hundred
million of the roughly one billion authorized shares in New
reorganized Calpine that remain unissued"; (2) remand to the
Bankruptcy Court so that Appellants can interpose an objection
to the valuation of Calpine in the Sixth Amended Plan, conduct
reasonable, limited discovery in connection with that
objection ... and appear and present evidence as to proper
valuation";[10] and "to the extent the properly determined
valuation of reorganized Calpine exceeds the amount of its
debt, to distribute the excess value to Calpine's former
shareholders in the form on New Calpine Common Stock from the
authorized, reserved shares." (Appellants' Reply Br. at 5.)

Regardless of how the relief sought is characterized, a

---

[10] As part of the valuation hearing, Compania Appellants seek to use
analyst reports created after the Confirmation hearing that the Bankruptcy
Court struck as hearsay on January 15, 2008.

review of the parties' submissions indicates that Appellants are seeking, in essence, a new valuation hearing and to have an additional 300 million shares of New Calpine Stock issued and reserved for future distribution to Old Calpine Shareholders in accordance with the Bankruptcy Court's findings.[11]   Appellants argue that the Court can order effective relief because such relief will have "minimal interference to other interests." (Appellants' Reply Br. at 6.) Specifically, Appellants claim that such relief will not affect creditors being paid in full. Appellants contend that, assuming the proposed new valuation hearing results in a higher TEV, the issuance of additional stock to Old Calpine Shareholders would simply reduce the value of creditors' stock by the amount they received in excess of the amount to which they are legally entitled. However, the Court does not see how such relief will have only minimal interference to other interests or that it would not disturb numerous consummated transactions and further transactions taken in reliance thereon. Appellants concede that "[t]he key issue relating to the Debtors' plan of reorganization was the value of the reorganized Debtors, and how much equity in the reorganized Debtors would go to creditors and how much would go to shareholders." (Opening Brief of Appellants, dated February

---

[11]   Appellants sought the same relief in their Stay Motion, which was denied by the Bankruptcy Court on January 24, 2008.

25, 2008, at 5.)

First, the Sixth Amended Reorganization Plan contains a non-severability provision, which states that none of its terms can be modified after confirmation, and that all of its provisions are "nonseverable and mutually dependent." (Sixth Amended Reorganization Plan at 88.) Because the Sixth Amended Reorganization Plan is non-severable, if the TEV were modified it would require the parties to negotiate a new joint reorganization plan. This would result in, among other things, Old Calpine Shareholders disgorging the Warrants[12] they received. The disgorgement of approximately 48.5 million Warrants, at least four million of which have already been traded, would be infeasible and inequitable to investors who subsequently purchased the Warrants in good faith. See, e.g., Adelphia, 367 B.R. at 94-96.

Second, if Calpine issued additional shares of New Calpine common stock for distribution to Old Calpine Shareholders, it would greatly dilute the share value of the stock already issued to creditors and traded. Also, the value of the Warrants issued to Old Calpine Shareholders would be similarly impacted. The Bankruptcy Court previously explained that such relief would cause substantial harm as "the issuance

---

[12] Appellees agreed to issue the Warrants to Old Calpine Shareholders as part of the Settlement, which contained an agreement between the parties that the TEV is $18.95 billion. Appellees contend that the Settlement and its agreed upon terms would not stand if the TEV were re-litigated.

22

of an additional 300 million shares [of Old Calpine Stock to

Old Calpine Shareholders] would dilute the share value of the

common [stock] issued under the plan by $6 a share, or some $3

billion in market value, and that there would be similar

injury to non-objecting shareholders who do not object to the

issuance of the [Warrants] in that the [Warrants] would suffer

a similar drop." (Feb. Hr'g Tr. at 71; see also Folse Decl. ¶

25.)   Therefore, modifying the TEV in a consummated plan of

reorganization that so many parties have relied upon in making

at least some potentially irrevocable decisions would be

inequitable.

Third, such relief would have potentially serious

consequences for Calpine's Canadian Debtors, which have made

distributions predicated on the value of New Calpine's equity

having a particular value.  (See Folse Decl. ¶¶ 28-29.)   The

potential impact of modifying the TEV would be inequitable to

the parties involved in Calpine's Candadian Proceedings

because the relief Appellants seek may affect the rights of

Calpine's Candadian Debtors and the parties in interest to the

Calpine Canadian proceedings.

Last, Appellants assume that a new valuation hearing will

result in a higher TEV, ignoring the possibility that the TEV

could be valued lower or equal to the $18.95 billion

previously determined and incorporated into the Sixth Amended

23

Reorganization Plan.[13]  If the Bankruptcy Court finds Debtors'
value to be lower than \$18.95 billion both Old Calpine
Shareholders and certain subordinated creditors would be
forced to disgorge their distributions under the Sixth Amended
Reorganized Plan's distributions (such as stocks and the
Warrants) in excess of the amount they would be entitled to
receive, if any, pursuant to the new TEV value.  And, were the
Bankruptcy Court to conclude that the TEV equaled the \$18.95
billion as originally determined, Old Calpine Shareholders
would still be required to disgorge the Warrants they received
because the Warrants were issued as part of the Settlement and
Appellees assert that the Settlement will not stand if the TEV
were re-litigated.

Therefore, the Court does not see how the issuance and
reservation of an additional 300 million shares of New Calpine
stock and the re-litigation of the TEV would not disturb the
numerous consummated transactions and further transactions
taken in reliance on the Sixth Amended Reorganization Plan.
Nor do Appellants explain how such relief would be implemented
and what would be required of all the other parties whose
interests are implicated.  Even if the Court could order such

---

[13] Appellants contend that if the TEV were to be valued equal to or lower
than \$18.95 billion then their objection should be rejected.  However,
this argument ignores that the Settlement would no longer be in effect
once the parties put it aside to re-litigate the TEV and that Debtors
could take their pre-settlement position that the TEV should be valued
lower than \$18.95 billion.

relief, this prospect would raise, as discussed below, substantial equitable concerns addressed by the following Chateaugay factors: affecting the re-emergence of the debtor as a revitalized corporate entity, and unraveling intricate transactions in a way that creates an unmanageable, uncontrollable situation for the Bankruptcy Court.

b.   The Relief Sought Will Affect the Re-Emergence of Debtor as a Revitalized Corporate Entity and Will Unravel Intricate Transactions so as to Create an Unmanageable Situation for the Bankruptcy Court

The second and third factors that Appellants must establish in order to rebut the mootness presumption are that the requested relief "will not affect the re-emergence of the debtor as a revitalized corporate entity" and "will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Chateaugay II, 10 F.3d at 953 (citation and quotation omitted). The Court finds that the relief sought by Appellants would cause both of these events to occur.

First, conducting a new valuation hearing, and issuing and reserving additional New Calpine common stock for the benefit of the Old Calpine Shareholders, may "affect the re-emergence of [Debtors] as a revitalized corporate entity." Chateaugay II, 10 F.3d at 953 (citations and quotation marks

25

omitted). Appellants claim the relief they seek is "narrowly tailored to ensure the viability of Calpine" and place the burden on Appellants to prove a "loss of confidence among ... customers, vendors, and other business partners," "breach of existing contractual relationships," or "loss of revenues, inability to secure new contracts, and cash flow problems ...." (Appellants' Reply Br. at 9 (citing In re Loral Space & Commc'ns Ltd., 342 B.R. 132, 139 (S.D.N.Y 2006).) However, the burden is on Appellants to establish that the requested relief "will not affect the re-emergence of the debtor as a revitalized corporate entity." Chateaugay II, 10 F.3d at 953 (citations and quotation marks omitted). As noted above, the provisions under the Sixth Amended Reorganization Plan are "nonseverable and mutually dependent," therefore, the parties would have to negotiate a new joint plan of reorganization and Debtors would be forced to reenter bankruptcy. (Sixth Amended Reorganization Plan at 88.) In addition, it is conceivable that, if Debtors were forced back into bankruptcy, the viability and effectiveness of numerous transactions could be called into doubt and potential harm may occur to Debtors' reputation. The Court agrees with Appellees' concerns that requiring a new confirmation process may result in the reinstatement of billions of dollars of debt, breaches in business arrangements, lost revenue and the creation of a

26

crisis of confidence for shareholders, creditors, customers, vendors, and employees. (See Folse Decl. at ¶ 8.) Therefore, Appellants have not met their burden of establishing that granting the relief they seek would not affect the re-emergence of Calpine as a revitalized corporate entity.

Second, even if conducting a new valuation hearing were feasible, granting such relief would be inequitable because it would not only imperil Debtors' successful reorganization but would "unravel intricate transactions so as to knock the props out from under" the Sixth Amended Reorganization Plan and "create an unmanageable, uncontrollable situation for the Bankruptcy Court." Chateaugay II, 10 F.3d at 953 (citation and quotation marks omitted). Appellants state that the value of subsequent market purchases of New Calpine Common Stock or Warrants would be "implicated" by the issuance of additional Calpine stock, but Appellants minimalize the impact of such relief. (Appellants' Reply Br. at 9.) As explained above, New Calpine has engaged in numerous transactions, releases and settlements in reliance on the effectiveness of the Sixth Amended Plan. Those actions include: discharging more than $12 billion of debt — held by more than 2,600 creditors — and permanently enjoined those creditors from asserting claims against Calpine; closing on a $7.3 billion exit financing facility and using $3.88 billion of those funds to pay off its

27

debtor-in-possession financing facility; making wire transfers of over \$4 billion dollars to satisfy various secured and administrative claims; issuing approximately 417 million shares of New Calpine Common Stock to thousands of creditors; distributing 9.7 million shares of New Calpine Common Stock to an escrow account for the benefit of certain holders of unsecured bonds pending resolution of an intercreditor dispute; causing the stock of New Calpine to begin trading on the NYSE; and issuing 48.5 million warrants to Old Calpine Shareholders. (See Folse Decl. at ¶¶ 12-18.)

Thus, too many extensive and complex transactions have been consumated at this point to permit granting Appellants the relief they seek without creating an impractical and unmanageable situation for the Bankruptcy Court.  See, e.g., In re Home Holdings, Inc., No. 98 Civ. 5690, 2001 WL 262750, at *6 (S.D.N.Y. Mar. 16, 2001) ("Like other substantially consummated complex reorganizations, [the] reorganization here affects numerous parties, including various classes of creditors and shareholders, and involves a multitude of complex transactions making tinkering with the Plan impracticable."); In re E-II Holdings Inc., No. 94 Civ. 2246, 1995 WL 387650, at *5 (S.D.N.Y. June 30, 1995) (finding appeal moot when consummated transactions "included, among other things, over a billion dollars of transfers from the debtor to

its creditors, the procurement of financing for the post-bankruptcy corporation, and the issuance of stock and other securities in the post-bankruptcy corporation").

### c. The Parties Who Would Be Adversely Affected Have Not Had Notice of the Appeals and An Opportunity to Participate

The fourth factor that Appellants must establish in order to rebut the mootness presumption is that the parties who would be adversely affected have notice of the Appeals and an opportunity to participate in the proceedings. See Chateaugay II, 10 F.3d at 953. Here, those who would be adversely affected include the reorganized Debtors' creditors, and others who participated in and relied upon transactions approved in the Sixth Amended Reorganization Plan and subsequently completed, and the further transactions taken in reliance thereon. Appellants assert that they served their notice of motion upon the list of all interested parties involved in Debtors' reorganization but they do not contend that they have notified all such parties that would be adversely affected. Nonetheless, Appellants argue that there was "significant media coverage" following the filing of the Appeals and throughout the underlying bankruptcy proceedings, and that public information was available. (Appellants' Reply Br. at 11.) Specifically, Appellees assert that even though subsequent purchasers of New Calpine Common Stock were not

29

served with process, it "does not mean that such purchasers do not have actual or constructive notice."  (Id.)   The Court disagrees.  An assertion by Appellants that purchasers of New Calpine Common Stock may have constructive or actual notice is not sufficient to satisfy their burden of establishing that such purchasers had notice of the Appeals and an opportunity to participate in the proceedings.   Thus, the Court is persuaded that this factor also weighs toward a finding that the Appeals are moot.

### d.   Appellants Did Not Pursue With Diligence All Available Remedies

The fifth factor that Appellants must establish in order to rebut the mootness presumption is that they must have "pursued with diligence all available remedies to obtain a stay of execution of the objectionable order[,] if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."  Chateaugay II, 10 F.3d at 953 (citation and quotation omitted).

First, Felluss does not dispute that he did not seek a stay but asserts that "[f]ailure to obtain a stay pending appeal does not compel a finding of equitable mootness." (Felluss's Reply Brief, dated April 7, 2008, at 27 (citations omitted).)   However, seeking a stay is of the utmost importance to an appellant desiring to preserve an appeal of a confirmation order.  See Metromedia, 416 F.3d at 144 (noting

30

that whether the appellant sought a stay of confirmation is a "chief consideration" under Chateaugay II). The Second Circuit "insist[s] that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one." Id.; see also Chateaugay I, 988 F.2d at 326 ("The party who appeals without seeking to avail himself of that protection does so at his own risk."); Texaco, 92 B.R. at 46. Here, Felluss did not pursue with diligence all available remedies to obtain a stay, therefore, this factor weighs in favor of determining that his appeal is moot. See Metromedia, 416 F.3d at 144; Texaco, 92 B.R. at 46.

Second, while Compania Appellants, joined by Appellants Flair and Ninyo,[14] sought a stay before both the Bankruptcy Court and this Court,[15] they failed to pursue their initial Stay Motion in the Bankruptcy Court and the Expedited Motion in this Court with diligence. Their failure to do so creates a situation rendering it inequitable to grant Appellants the relief they seek. See Chateaugay II, 10 F.3d at 953. However, even if the Court were to conclude that Compania Appellants did diligently pursue a stay, substantial equitable

---

[14] Appellants Flair and Ninyo state in their reply brief that they filed a joinder motion in the Bankruptcy Court to the Compania Appellants' Stay Motion, however, such a motion was not docketed by the Bankruptcy Court. For the purposes of deciding this appeal, the Court assumes that such motion was filed.

[15] Appellant Root joined Compania Appellants' motion for a stay in this Court but did not file a motion for stay in the Bankruptcy Court.

31

concerns still remain when considering the previously discussed Chateaugay factors that would render the Appeals moot.

Appellants filed their initial Stay Motion in the Bankruptcy Court on January 18, 2008,[16] three days after the entry of the Reconsideration Order and one month after the Confirmation Order.   Moreover, after the Bankruptcy Court denied the Stay Motion on January 24, 2008, Compania Appellants did not file a stay in this Court until the following day. Although the Sixth Amended Reorganization Plan was set for consummation within seven days at most, Compania Appellants filed the Expedited Motion but they neglected to apply for expedited briefing. This Court held a hearing on February 1, 2008, one day after the consummation of the Sixth Amended Reorganization Plan, and rejected Appellants Expedited Motion, noting that the stay had "been mooted by the closing of the exit financing and the issuance of the common stock as contemplated by the confirmed plan." (Feb. Hr'g Tr. at 67:10-12.)   Therefore, Compania Appellants failed to act diligently to ensure that a hearing on the Expedited Motion would occur prior to consummation of the Sixth Amended Reorganization Plan and to prevent the implementation of the numerous transactions

---

[16] Appellants sought a stay at the hearing for their motion for reconsideration but were instructed by the Bankruptcy Court that they must file the motion on appropriate application.

32

flowing from its consummation.

In addition, Appellants' failure to pursue with diligence all available remedies to obtain a stay creates a situation rendering it inequitable to provide Appellants the relief they seek. See Metromedia, 416 F.3d at 144. The question "is not solely whether [the Court] can provide relief without unraveling the [Sixth Amended Reorganization Plan], but also whether [the Court] should provide such relief in light of fairness concerns." Id. at 145. Here, countless transactions involving numerous parties and billions of dollars, as set forth above, have taken place in furtherance of, and in reliance on, the Sixth Amended Reorganization Plan. A disruption of these intricate transactions and numerous reliance interests, when Appellants did not act diligently to pursue a stay before such transactions and interests were consumated, would weigh in favor of determining that the Appeals are moot.

## III.   ORDER

For the reasons stated above, the Court finds that the appeals of Compania Internacional Financiera, S.A., Coudree Global Equities Fund, Standard Bank of London, and Leonardo Capital Fund SPC (collectively, "Compania Appellants"); David Flair, Avram Ninyo, and Merle Root (collectively, "Flair Appellants"); and Elias A. Felluss ("Felluss") are moot.

Accordingly, it is hereby

**ORDERED** that the appeal [Docket No. 1, 08 cv 1286] of Compania Appellants is DENIED; and it is further

**ORDERED** that the appeal [Docket No. 1, 08 cv 1815] of Flair Appellants is DENIED; and it is further

**ORDERED** that the appeal [Docket No. 1, 08 cv 1717] of Felluss is DENIED.


The Clerk of Court is directed to withdraw any pending motions and to close this case.


**SO ORDERED.**

Dated: New York, New York
     6 June 2008

                                       Victor Marrero
                                          U.S.D.J.